**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**GENRON ENTERPRISES, LTD.,**

      **Plaintiff,**

-vs-                                           **Case No. 6:05-cv-1765-Orl-31KRS**

**METECNO PANEL SYSTEMS, INC. d/b/a**
**METECNO ALUMA SHIELD,**

      **Defendants.**

_____

# ORDER

The Plaintiff, Genron Enterprises, Ltd. ("Genron") has sued Metecno Panel Systems, Inc. ("Metecno") on a number of grounds, all arising from a relationship between the parties whereby Metecno was to supply certain materials to Genron for use in a construction project.[1] This matter is presently before the Court on Metecno's Motion to Dismiss Counts VI, VII and VIII, (Doc. 15), and Genron's Opposition thereto, (Doc. 28).

**I.    Background**

    A. Parties

Genron, an industrial building contractor, is a Canadian corporation, doing business as Bond-A-Ply ("BAP"). Aluma Shield Industries ("Aluma") recently changed its name to Metecno Panel Systems, Inc., but continues to operate under the Aluma trade name. Aluma, which

---

[1] Genron's Complaint appears at Doc. 1.

manufactures and sells metal products for buildings, has its principal place of business in Deland, Florida.[2]

B. Facts

In August of 2000, BAP entered into a contract with Muskeg River Contractors ("Muskeg") to supply and install insulated metal walls, roof, and soffit panels for buildings as part of a certain project (the "Muskeg Contract"). As part of the Muskeg Contract, BAP was obligated to install the metal panels using an appropriate fastening system, which was to include the use of appropriate bolts to mount those panels in accordance with the specifications provided to BAP by Muskeg (the "Specifications"). These Specifications stated that Aluma's wall panels described as "AW-200" and roof panels described as "HR-900" were among the pre-approved products for the project. The Structural Design Criteria portion of the Specifications specified that a stainless steel fastening system was to be used, and described in detail the load factors, stresses and environmental conditions to which the fastening system would be exposed.

After the execution of the Muskeg Contract, BAP and Aluma communicated over a period of time, during which time BAP sought assurances from Aluma that the materials Aluma was to supply, including the bolts, met all of the Specifications and could withstand certain stresses and weather conditions. On October 11, 2000, Aluma provided BAP with a bid for the project, which contained the statement that "IT IS THE INTENT OF THIS BID TO COMPLY WITH THE SPECIFICATIONS." Then, on November 17, 2000, in response to BAP's request for additional

---

[2] Throughout this Order, unless otherwise necessary, the Court will refer to the parties by their trade names, BAP and Aluma.

information, Aluma provided BAP with a signed letter assuring BAP that the materials to be provided would completely comply with all relevant Specifications.

BAP accepted Aluma's bid on December 27, 2000, in the form of a purchase order (the "Purchase Order"), which contained the terms and conditions of the transaction. The Purchase Order stated that Aluma could not make any substitutions or changes without authority from BAP. Aluma's obligations under the Purchase Order included the obligation to deliver materials in a timely manner, fit for their intended purpose, free from defects and conforming to all applicable Specifications.

Aluma notified BAP on March 9, 2001 that its panels required the use of cadmium-plated, carbon steel bolts, rather than the stainless steel bolts required by the Speficiations, and forwarded to BAP documentation stating that the performance of these cadmium/carbon bolts was superior to that of stainless steel bolts. Aluma subsequently warranted that these cadmium/carbon bolts would be "totally protected" from "contact with corrosion," and that these bolts were highly resistant to corrosive chemicals. Several weeks later, Aluma modified this recommendation, this time recommending carbon steel bolts coated with an epoxy or plastisol material. Aluma assured BAP that these carbon/coated bolts would perform better than the specified stainless steel bolts.

From March of 2001 through October of that same year, BAP installed Aluma's panels using the carbon/coated bolts Aluma supplied. BAP asserts that many, if not all, of the bolts Aluma supplied were not properly coated and instead were less expensive galvanized carbon steel bolts, and that these bolts were neither suitable for the project nor in compliance with the Specifications.

Muskeg notified BAP on December 5, 2002, that Aluma's panels were shearing away from Muskeg's buildings as a result of the fracturing and separation of the mounting bolts. BAP notified Aluma of the problem and requested that Aluma replace all of the nonconforming bolts, but Aluma has failed and refused to do so. BAP must now replace the bolts Aluma supplied, remount the panels with appropriate bolts, and replace any damaged panels.

C. Claims and Arguments

BAP has sued Aluma on a number of grounds, only three of which are relevant here. In Count VI, which BAP has labeled "Interference with Contractual Advantage," BAP asserts that it entered into a contract with Muskeg for the purpose of economic gain, and that Aluma interfered with that contract when it supplied nonconforming bolts. In Count VII, "Intentional Misrepresentation," BAP asserts that Aluma represented that the carbon/coated bolts were the most appropriate bolts for the project, which was a misrepresentation of a material fact, and which Aluma made with knowledge of its falsity or which Aluma made after intentionally failing to determine the truth or falsity thereof. Count VIII, "Negligent Misrepresentation," which is brought in the alternative to Count VII, alleges that prior to the time when Aluma represented that the carbon/coated bolts were the most appropriate bolts for the project, it did not use ordinary care in determining the truth or falsity of that representation.

Aluma has moved to dismiss these three counts, arguing that: (1) Count VI should be dismissed because BAP has not alleged any interference with the Muskeg Contract; and (2) Counts VII and VIII should be dismissed because they are barred by the economic loss rule.

**II.     Standard of Review**

In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff, *Cannon v. Macon County*, 1 F.3d 1558, 1565 (11th Cir. 1993), and must limit its consideration to the pleadings and any exhibits attached thereto. FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993). The Court will liberally construe the complaint's allegations in the Plaintiff's favor, *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969), and will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), "courts must be mindful that the Federal Rules require only that the complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief." *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (*citing* FED. R. CIV. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id*. (internal citation and quotation omitted). "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to

the claim being asserted against him and the grounds on which it rests." *Sams v. United Food and Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir. 1989).

### III.    Legal Analysis

A. Tortious Interference (Count VI)

The elements for a claim for intentional interference with a contractual or business relationship are:[3]

> (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damages to the plaintiff as a result of the breach of the relationship.

*Networkip, LLC v. Spread Enters., Inc.*, 922 So. 2d 355, 358-59 (Fla. 3rd DCA 2006); *see also Farah v. Canada*, 740 So. 2d 560, 561 (Fla. 5th DCA 1999) (elements of intentional interference with contract are "1) the contract; 2) the wrongdoer's knowledge thereof; 3) his intentional procurement of its breach; 4) the absence of justification; and 5) damages.") (internal citation and quotation omitted). This claim thus requires a showing of several elements, including "both an intent to damage the business relationship and a lack of justification to take the action which caused the damage," *Networkip*, 922 So. 2d at 359, as well as the existence of a relationship "which in all probability would have been completed if the defendant had not interfered." *Cent. States*, 824 So. 2d at 940. In addition, the plaintiff must demonstrate causation, which "is established when one intentionally and improperly interferes with a business relationship between

---

[3] "Tortious interference with a contract and tortious interference with a business relationship are basically the same cause of action. The only material difference appears to be that in one there is a contract and in the other there is only a business relationship." *Cent. States, S.E. & S.W. v. Fla. Soc. of Pathologists*, 824 So. 2d 935, 940 (Fla. 5th DCA 2002).

two other parties by 'inducing or otherwise causing' one party to breach or sever the business relationship." *St. John's River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So. 2d 500, 504 (Fla. 5th DCA 2001).

BAP alleges that: (1) "[b]ecause [Aluma] intentionally, and without privilege, engaged in conduct (including active efforts to obtain approval for use of nonconforming bolts) as alleged above, [Aluma] interfered with the contractual relations between [BAP] and [Muskeg];" and (2) "[a]s a direct and proximate result of [Aluma's] interference with the contractual relationship between [BAP] and [Muskeg], [BAP] has incurred and will continue to incur losses . . . ." (Doc. 1 at 19). These allegations do not demonstrate that Aluma intentionally interfered with Aluma's contract or relationship with Muskeg. There are no allegations that Aluma: (a) acted intentionally, (b) to interfere in the BAP-Muskeg relationship, (c) resulting in the breach of the BAP-Muskeg contract or the end of their business relationship. BAP's allegations, on their face, demonstrate only that Aluma was attempting to perform under its contract with BAP to provide bolts, and that Aluma failed to perform as required. The fact that BAP's breach of the Aluma-BAP contract might cause BAP to be liable to a third party (Muskeg) does not amount to intentional (tortious) interference with the contract or business relationship between BAP and that third party.

B. Misrepresentation (Counts VII and VIII)

Aluma argues that BAP's claims for intentional and negligent misrepresentation are barred by the economic loss rule. The economic loss rule "is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are

economic losses."[4] *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 536 (Fla. 2004). One such circumstance arises "when the parties are in contractual privity and one party seeks to recover damages in tort for matters arising from the contract." *Id*. This prohibition against using a tort action to attempt to recover economic damages is designed "to prevent parties to a contract from circumventing the allocation of losses set forth in the contract . . . ." *Id*. As the Florida Supreme Court has stated:

> Underlying this rule is the assumption that the parties to a contract have allocated the economic risks of nonperformance through the bargaining process. A party to a contract who attempts to circumvent the contractual agreement by making a claim for economic loss in tort is, in effect, seeking to obtain a better bargain than originally made. Thus, when the parties are in privity, contract principles are generally more appropriate for determining remedies for consequential damages that the parties have, or could have, addressed through their contractual agreement. Accordingly, courts have held that a tort action is barred where a defendant has not committed a breach of duty apart from a breach of contract.

*Id*. at 536-37. This rule arises from the basic difference between contract law, which protects parties' expectations, and tort law, which is determined by the duty owed to the injured party. *Casa Clara*, 620 So. 2d at 1246. Thus,

> [f]or recovery in tort, there must be a showing of harm above and beyond disappointed expectations. A buyer's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects.

---

[4] "Economic losses are, simply put, disappointed economic expectations. . . . [E]conomic loss has been defined as damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits." *Indem. Ins.*, 891 So. 2d at 536 n.1 (internal citation and quotation omitted); *see also Casa Clara Condo. Ass'n, Inc. v. Charley Toppino & Sons, Inc.*, 620 So. 2d 1244, 1246 (Fla. 1993) ("damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits -- without any claim of personal injury or damage to other property") (internal citation and quotation omitted).

*Id.*[5]  Accordingly, contract principles are more appropriate than tort principles for recovering economic loss unaccompanied by physical injury or property damage.  *Id*. at 1247; *see also Employers Reinsurance Corp. v. Neighborhood Health P'ship, Inc.*, 2003 WL 23833948 at *4 (S.D. Fla. April 17, 2003) ("[A] party may not pursue a claim in tort for solely economic losses unless the party breaching the contract has committed a tort which is distinguishable from or independent of the breach of contract.") (internal citation and quotation omitted).

Exceptions to this rule exist under limited circumstances, such as for intentional or negligent acts considered to be independent from the acts that breached the contract, for example, for fraud in the inducement and negligent misrepresentation.  *Indem. Ins.*, 891 So. 2d at 537; *D&M of Jupiter, Inc. v. Friedopfer*, 853 So. 2d 485, 487 (Fla. 4th DCA 2003).  A tort is independent where it requires proof of facts separate and distinct from the breach of the contract.  *Straub Capital Corp. v. L. Frank Chopin, P.A.*, 724 So. 2d 577, 579 (Fla. 4th DCA 1998).  The distinction must therefore be made between misrepresentations relating to the breaching party's performance of the contract and misrepresentations constituting a term of the parties' bargain.[6]  *D&M*, 853 So.

---

[5] *See also Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 510 So. 2d 899, 901 (Fla. 1987):

> Tort law imposes upon manufacturers a duty to exercise reasonable care so that the products they place in the marketplace will not harm persons or property. However, tort law does not impose any duty to manufacture only such products as will meet the economic expectations of purchasers. Such a duty does, of course, exist where the manufacturer assumes the duty as part of his bargain with the purchaser, or where implied by law, but the duty arises under the law of contract and not under tort law.

[6] "If the misrepresentation is made to induce the completion of the transaction, then it is a term of the bargain." *Royal Surplus Lines Ins. Co. v. Coachmen Industries, Inc*., 2002 WL 32894915 at *20 (M.D. Fla. Sept. 17, 2002).

2d at 487-88; *Straub Capital*, 724 So. 2d at 579; *Typhoon Int'l Corp. v. Comag Mktg. Group*, LLC, 2005 WL 3312338 at *3 (M.D. Fla. Dec. 7, 2005) ("The test to determine if the economic loss rule applies is to ask if the fraud alleged is in an act of performance or in a term of the bargain.") (internal citation and quotation omitted).

> Misrepresentations relating to the breaching party's performance of a contract do not give rise to an independent cause of action in tort, because such misrepresentations are interwoven and indistinct from the heart of the contractual agreement. Therefore . . . where the alleged . . . misrepresentation is inseparable from the essence of the parties' agreement the economic loss rule applies and the parties are limited to pursuing their rights in contract.

*Straub Capital*, 724 So. 2d at 579 (internal citation and quotation omitted); *see also Royal Surplus Lines Ins. Co. v. Coachmen Indus., Inc.*, 2002 WL 32894915 at *20 (M.D. Fla. Sept. 17, 2002) ("A party is limited to his or her contractual remedies when the tort relates to the performance of the contract instead of a term of the bargain.").

On the other hand, where "fraudulent misrepresentation and negligent misrepresentation in the formation of a contract are alleged, the economic loss rule does not bar the tort action based on such misrepresentations." *Cowley v. Nero*, 693 So. 2d 120, 121 (Fla. 2nd DCA 1997); *see also Innovative Med. Servs., Inc. v. Reitz*, 793 So. 2d 125, 127 (Fla. 2nd DCA 2001) (claims for intentional and negligent misrepresentation arising from statements allegedly made to induce plaintiff to enter contract were not barred by economic loss rule); *Pearson v. Ford Motor Co.*, 694 So. 2d 61, 69 (Fla. 1st DCA 1997) (action based on allegations of fraudulent and negligent misrepresentation in formation of contract not barred by economic loss rule).

BAP's allegations regarding Aluma's alleged misrepresentations may be summarized as follows: (1) Aluma provided BAP with a bid for the project and assured BAP that the materials

would comply with the Specifications; (2) BAP accepted Aluma's bid on December 27, 2000, forming a contract for the purchase and sale of Aluma's products, including the bolts; (3) the contract between Aluma and BAP obligated Aluma to deliver materials, including the bolts, that conformed to the Specifications; (4) thereafter Aluma recommended that BAP use carbon/coated bolts; (5) BAP used the carbon/coated bolts when installing panels at the project; and (6) the carbon/ coated bolts Aluma supplied were not what Aluma represented them to be, and did not function as represented.  Basically, BAP argues that it and Aluma entered a contract for materials, and Aluma subsequently represented that certain materials, particularly the defective bolts in question, would meet the required Specifications (and that Aluma would supply these bolts). These representations were made approximately three months after the formation of the contract between BAP and Aluma, and there is no allegation (nor, seemingly, could there be) that these representations were made to induce BAP to enter into that contract.[7]

Even construing the Complaint generously in favor of BAP, it is clear that Aluma made the representations about the defective bolts in connection with its obligation to provide materials according to the (previously executed) contract.  BAP now asserts that Aluma did not supply the type of bolts it represented it would supply and that the bolts supplied did not perform as Aluma represented that they would perform.  However, inasmuch as these alleged misrepresentations relate directly to Aluma's obligation to perform under the contract, they are "interwoven and

---

[7] BAP's Complaint may be read to assert that BAP entered into a contract with Aluma based on Aluma's representations that the materials it (Aluma) supplied would conform to the Specifications.  Those Specifications call for a stainless steel mounting system.  BAP did not allege that Aluma originally intended to supply anything other than a stainless steel mounting system, and thus, despite the fact that Aluma later modified its recommendations for the bolt type, there are no allegations demonstrating that Aluma induced BAP to accept its bid based on any misrepresentations.

indistinct from the heart of the contractual agreement,", and BAP's claims based on them are therefore barred by the economic loss rule.  *Straub Capital*, 724 So. 2d at 579 (barring action for negligent misrepresentation where misrepresentation related to breaching party's performance of contract); *see also Am. Color Graphics, Inc. v. Brooks Pharmacy, Inc.*, 2006 WL 539543 at *3 (M.D. Fla. Mar. 6, 2006) (granting motion to dismiss claim based on economic loss rule where plaintiff's claim was "not independent of but rather wholly dependent on [defendant's] alleged breach of contract").

**IV.    Conclusion**

For the reasons discussed herein, BAP has failed to allege a cause of action for tortious interference, and its claims for intentional and negligent misrepresentation are barred by the economic loss rule.  Accordingly, it is

**ORDERED THAT** Aluma's Motion to Dismiss (Doc. 15) is GRANTED.  Counts VI, VII and VIII of BAP's Complaint are dismissed.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on April 17, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party